SEEGER WEISS LLP
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
Telephone:  212/584-0700
212/584-0799 (fax)
cseeger@seegerweiss.com
cayers@seegerweiss.com


Attorneys for Plaintiff

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| KEVAN PFEIFER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | No. |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| GERON CORPORATION, JOHN A. SCARLETT and OLIVIA K. BLOOM, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | DEMAND FOR JURY TRIAL |

Plaintiff Kevan Pfeifer individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Geron Corporation ("Geron" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of Geron securities between March 19, 2018 and September 26, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").  These claims are asserted against Geron and the Company's President and Chief Executive Officer ("CEO"), John A. Scarlett ("Scarlett"), and Chief Financial Officer ("CFO"), Olivia K. Bloom, who made materially false and misleading public statements during the Class Period.

2.     Geron is a clinical-stage biopharmaceutical company focused on the development of a telomerase inhibitor, imetelstat, for the treatment of hematologic myeloid malignancies.

3.     Geron partnered with Janssen Biotech Inc. ("Janssen"), a division of Johnson & Johnson, for the development of imetelstat.  During the Class Period, Janssen had the option regarding whether or not to continue this partnership.  If Janssen decided to continue with the collaboration, it would owe Geron an upfront payment of $65 million, with hundreds of millions of dollars in additional milestone payments possible.

4.     Janssen would make its decision based in part on the results of the IMbark Phase 2 trial.  Janssen was conducting that trial under the supervision of the Joint Steering Committee ("JSC") consisting of both Geron and Janssen employees.  The JSC conducted an internal, nonpublic review of the IMbark results in March 2018.  That review, as well as earlier results, showed that IMbark was a failure.

5.     The two primary endpoints for the study, the results that would determine whether the study was successful or not, were (i) the spleen response rate, which measured the reduction in spleen swelling, and (ii) a composite of various symptoms called the Total Symptom Score ("TSS").  In order for IMbark to succeed, patients in the study needed to show at least a 35% reduction in spleen volume and a minimum 50% reduction in TSS.

6.     The actual results of the IMbark study were a disappointing spleen response rate of 10% and a reduction in TSS of 32% – far below the results required for success.  These poor results undermined the future revenue potential of imetelstat and the viability of Geron's continued partnership with Janssen.

7.     On March 19, 2018, Geron held a conference call with investors, analysts, and the media wherein defendant Scarlett discussed the median overall survival of patients in the IMbark study, one of the study's secondary endpoints. Generally, a median value is that which separates the lower half and upper half of a data set.  In this context, it referred to the amount of time that elapsed before half of the patients in the study had passed away.  Scarlett announced that the median overall survival had not been reached after 19 months, meaning that the final median would necessarily be greater than 19 months.  He further claimed that, by comparison, an analysis of "real world" data showed that patients with myelofibrosis who discontinued or no longer responded to their medication showed median overall survival of seven months.  Scarlett thus suggested that the IMbark study supported the conclusion that imetelstat lengthened the lives of patients with myelofibrosis. However, Scarlett failed to disclose the failure to reach the primary endpoints of the study: namely, spleen response rates and reductions in TSS.

8.      Throughout the Class Period, defendants misled investors regarding imetelstat and the results from the IMbark trial.  Specifically, defendants concealed material information and/or failed to disclose that:

(a)      the March 2018 JSC internal study review and earlier end-point data, which had been gathered since at least April 2017, had demonstrated that the IMbark study failed to achieve its primary endpoints related to reductions in spleen volume and TSS;

(b)      the secondary outcome measures and survival rates defendants chose to selectively publicize did not overcome the failure of the IMbark study to achieve its primary endpoints;

(c)      as a result, there was a significantly increased risk and high likelihood that Janssen would decline to continue its collaboration with Geron on imetelstat development; and

(d)      as a result, defendants' positive statements regarding imetelstat and the IMbark trial during the Class Period were false and misleading and/or lacked a reasonable basis.

9.      On March 27, 2018, Adam Feuerstein ("Feuerstein"), a veteran biotech journalist, published an article questioning the results of the IMbark trial and calling on defendants to disclose IMbark's primary endpoint data in order to help investors evaluate defendants' claims.

10. On this news, the price of Geron common stock declined 29% over two trading days on abnormally high trading volume.

11. Then, on September 27, 2018, defendants issued a press release that contained the full results of the IMbark study. In order for the study to be considered successful, it required at least a 35% reduction in spleen volume in patients taking the drug. The actual result was 10%. Similarly, the study required patients taking the drug to show at least a 50% reduction in TSS. The actual reduction was 32%. As such, the IMbark study by its own terms was a failure. Additionally, defendants further announced that Janssen had decided to terminate its partnership with Geron.

12. As a result of these disclosures, the price of Geron common stock plummeted $3.92 per share to close at $2.31 per share on September 27, 2018, a decline of 63%.

13. As a result of the fraudulent conduct alleged herein, plaintiff and other members of the Class (defined below) purchased Geron securities at artificially inflated prices and suffered significant losses and damages.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

16.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.  The Company maintains primary offices in Parsippany, New Jersey, and has slated this location for business development and commercial operations related to imetelstat.

17.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

18.    Plaintiff Kevan Pfeifer, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased Geron securities during the Class Period and has been damaged thereby.

19.    Defendant Geron Corporation is a biopharmaceutical company.  The Company's common stock trades on the NASDAQ, under the ticker symbol "GERN."

20.     Defendant John A. Scarlett was, at all relevant times, CEO and President of the Company.  In December 2018 he was also appointed Chairman of Geron's Board of Directors.

21.     Defendant Olivia K. Bloom ("Bloom") was, at all relevant times, Geron's CFO.

22.     During the Class Period, the Individual Defendants ran the Company as hands-on managers overseeing Geron's operations and finances.  The Individual Defendants had intimate knowledge about core aspects of Geron's financial and business operations, data from the Company's IMbark trial, status of the Janssen partnership, and the commercial viability of imetelstat.  They were also intimately involved in deciding which disclosures would be made by Geron.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants, because of their positions with Geron, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be

misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

23.   Defendants are liable for making false statements and/or failing to disclose adverse facts known to them about Geron.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Geron securities was a success, as it: (a) deceived the investing public regarding Geron's business and operations; and (b) caused plaintiff and other members of the Class to purchase Geron securities at artificially inflated prices.

## BACKGROUND

24.   Imetelstat was Geron's sole product candidate.  Defendant Scarlett has stated that "Geron has one major asset, which is imetelstat."  Imetelstat was hoped to inhibit telomerase, a ribonucleoprotein implicated in cell death and longevity that is found in most cancer cells, as a potential means for treating certain blood cancers. The Company was developing imetelstat with Janssen pursuant to a Collaboration and License Agreement ("CLA").  The CLA became effective on December 15, 2014, upon which Geron received a $35 million upfront payment from Janssen.

25.   Under the CLA, Janssen was granted the exclusive rights to develop and commercialize imetelstat worldwide for all indications in oncology, including hematologic myeloid malignancies, and all other human therapeutic uses.  Janssen

- 8 -

was wholly responsible for developing, manufacturing, seeking regulatory approval for, and commercialization of, imetelstat.

26.     At the start of the Class Period, Janssen was conducting two clinical trials of imetelstat: (i) IMbark, a Phase 2 trial in myelofibrosis ("MF"); and (ii) IMerge, a Phase 2/3 trial in myelodysplastic syndrome ("MDS").  Pursuant to the CLA, Geron contributed 50% of the development costs for these trials.

27.     The IMbark trial for imetelstat, although conducted by Janssen, was supervised by the JSC, which, pursuant to the CLA, comprised three Geron employees and three Janssen employees.  The co-primary efficacy endpoints for the IMbark trial were spleen response rate, defined as the proportion of patients who achieve a greater than or equal to 35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a greater than or equal to 50% reduction in TSS, at 24 weeks.  The study also had 14 secondary outcome measures, the fifth of which was overall survival.

28.     The first patient was enrolled in IMbark in September 2015 and the last was enrolled in October 2016.  Because the final spleen volume reduction and symptom scores were measured after patients had been taking the drug for 24 weeks, the data regarding these endpoints was available by mid-2017.  Nonetheless, the study was scheduled to continue until a set number of patients perished or April 2018, whichever came first.

29.     Under the CLA, if imetelstat failed to meet criteria determined by Janssen to support continuation of development, or for any other reason, Janssen could unilaterally discontinue the imetelstat program and terminate the CLA. Nevertheless, under the CLA, Janssen was required to undertake a primary analysis of the IMbark study and notify Geron whether it would: (i) maintain the license rights granted under the CLA and continue the development of imetelstat; or (ii) discontinue the development of imetelstat and terminate the CLA.  Geron announced that it expected Janssen's decision by the end of the third quarter of 2018 (*i.e.*, September 30, 2018).

30.     According to the CLA, if Janssen decided to continue with the collaboration, it would owe Geron a milestone payment of $65 million, with hundreds of millions of dollars in additional milestone payments possible.

31.     However, if Janssen decided to terminate the CLA, Geron would face severe consequences.  Geron described some of those consequences as follows:

- we would no longer have the right to receive any milestone payments or royalties under the Collaboration Agreement;

- further development of imetelstat, if any, would be significantly delayed or terminated;

- we would bear all risks and costs related to any further clinical development, manufacturing, regulatory approval and commercialization of imetelstat, if any;

- we might determine that the commercial potential of imetelstat does not warrant further development of imetelstat by us, in

which case the development of imetelstat would cease, which might cause us to cease operations; [and]

• we would need to raise substantial additional capital if we were to choose to pursue imetelstat development on our own, or we would need to establish alternative collaborations with third parties, which might not be possible in a timely manner, or at all, or might not be possible on terms acceptable to us, in which case it would likely be necessary for us to limit the size or scope of the imetelstat development program.

32.    The JSC conducted a data review of the IMbark study in March 2018. All of the patients in the IMbark study were taking imetelstat, so the results were not "blinded," meaning that the JSC members could see how patients were faring on the drug.  Accordingly, the JSC learned of the co-primary efficacy endpoint results (*i.e.*, spleen reduction and TSS results) during that data review, which included an analysis and review of end point data that had been generated since at least April 2017.

### DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

33.    On March 19, 2018, Geron held a conference call with investors, analysts, and the media to discuss the Company's fourth quarter and full-year 2017 financial results.  During the call, defendant Scarlett discussed the IMbark study at length, but failed to disclose that the primary efficacy endpoints had not been satisfied, stating in part:

This morning I'll start my remarks with a summary of the results from the latest internal data review conducted by Janssen on the IMbark, and

an update on the projected timing of the protocol-specified primary analysis for IMbark and the subsequent potential continuation decision from Janssen. I'll then conclude with the status of the IMerge trial, including a recap of the data that was recently presented at the American Society for Hematology or ASH Annual Meeting, that was in last December.

As a reminder, IMbark is a Phase 2 clinical trial designed to test 2 doses of imetelstat, 9.4 milligrams per kilogram or 4.7 milligrams per kilogram, administered every 3 weeks in intermediate-2 or high-risk MF patients who are refractory to or have relapsed after treatment with the JAK inhibitor. . . .

**_In reviewing the data, which was based on a January 2018 data cut, the collaboration's Joint Steering Committee, or JSC, made the following observations: first, the safety profile was consistent with prior clinical trials of imetelstat in hematologic malignancies and no new safety signals were identified; second, outcome measures for efficacy, including spleen volume responses and reductions in Total Symptom Score remain consistent with the prior data reviews; third, with a median follow-up of approximately 19 months as of the January 2018 data cut, the median overall survival has not been reached in either dosing arm._**

. . . Patients who remain on the treatment phase may continue to receive imetelstat, and until the primary analysis, all safety and efficacy assessments are being conducted as planned in the protocol, including following patients, to the extent possible, until death to enable an assessment of overall survival.

. . . Upon the completion of the protocol-specified primary analysis, the main trial will be completed.

34.    Rather than disclose the failure to reach the study's primary endpoints, defendant Scarlett misleadingly highlighted the study's secondary endpoints related to survival, claiming that the data review had provided reason to believe imetelstat increased survivals rates, stating in part:

As a third action, the JSC determined that Janssen will amend the IMbark protocol to establish an extension phase of the trial to enable patients remaining in the treatment phase to continue to receive imetelstat per investigator discretion.  During the extension phase, standard data collection will primarily consist of safety information. Patients will be continued to be followed for survival.

*The assessment of survival is important because we believe that a new treatment that could confirm improved survival would represent a meaningful clinical outcome for patients who are relapsed or refractory to the only approved MF treatment today.  As experience with JAK inhibitors increases, both in the real world and clinical trial settings, we know that the majority of MF patients fail or stop JAK inhibitor treatment and data from recent literature and other sources suggest that the survival of these patients is limited.*

For example, an analysis of real world data conducted by Janssen and presented at ASH in 2016 reviewed treatment patterns and outcomes of MF patients from 2 U.S. medical claims databases.  This analysis suggested that once patients fail or discontinue ruxolitinib, mean overall survival is approximately 7 months.  Three other recently published and independent papers describing outcomes of MF patients after discontinuing JAK inhibitor treatment, either in the context of a clinical trial or through commercial supply, estimated median overall survival of approximately 14, 15 or 16 months, respectively.  Thus, imetelstat potentially could address a significant unmet medical need if its use is associated with survival that is meaningfully longer than 14 to 16 months.

35.    On March 27, 2018, defendant Scarlett made a presentation at the 17th Annual Needham Healthcare Conference in New York City.  At the presentation, he introduced a slide entitled "IMbark Internal Data Reviews, Findings to Date."  The slide, which was also posted on Geron's website, purported to summarize "Internal data reviews completed by Janssen in September 2016, April 2017 and March 2018." It further stated: "Activity within multiple outcome measures observed, suggesting

clinical benefit . . . ."  The purportedly positive measures listed included "Range of reductions in spleen volume" and "Decreases in Total Symptoms Score (TSS)."  The slide also stated: "Median OS not reached in either dosing arm (with median follow-up of ~19 months at January 2018 data cut)."

36.    On May 10, 2018, Geron filed with the SEC its Form 10-Q for the first quarter of 2018, ended March 31, 2018, which was signed by defendant Bloom and certified under the Sarbanes-Oxley Act of 2002 ("SOX") by defendants Scarlett and Bloom, who attested to the Form 10-Q's accuracy.  The Form 10-Q stated: "The JSC concluded that as of January 2018, median follow up was approximately 19 months, and median overall survival had not been reached in either dosing arm."

37.    On July 31, 2018, Geron filed with the SEC its Form 10-Q for the second quarter of 2018, ended June 30, 2018, which was signed by defendant Bloom and certified under SOX by defendants Scarlett and Bloom, who attested to the Form 10-Q's accuracy.  The Form 10-Q stated: "The JSC also concluded that as of the January 2018 data cut-off date, with a median follow up of approximately 19 months, median overall survival had not been reached in either dosing arm."

38.    The statements referenced above in ¶¶33-37 were materially false and misleading when made, as they failed to disclose and misrepresented the following adverse facts that were then known to defendants or recklessly disregarded by them:

(a)    the March 2018 JSC internal study review and earlier end-point data, which had been gathered since at least April 2017, had demonstrated that the IMbark study failed to achieve its primary endpoints related to reductions in spleen volume and TSS;

(b)    the secondary outcome measures and survival rates defendants chose to selectively publicize did not overcome the failure of the IMbark study to achieve its primary endpoints;

(c)    as a result, there was a significantly increased risk and high likelihood that Janssen would decline to continue its collaboration with Geron on imetelstat development; and

(d)    as a result, defendants' positive statements regarding imetelstat and the IMbark trial during the Class Period were false and misleading and/or lacked a reasonable basis.

39.    On March 27, 2018, Feuerstein, a veteran biotech journalist, published an article in *STAT News*, an online life sciences publication entitled "The top-performing biotech stock this year has surged on flimsy data."  In the article, Feuerstein noted that Geron had failed to provide primary end point data from the IMbark trial despite the fact that such data had been in the Company's possession for nearly one year, and that, as a result, he questioned the efficacy of imetelstat and the purportedly positive trial results provided by defendants.

- 15 -

40.     On this news, the price of Geron common stock declined 29% over two trading days on abnormally high volume of over 30 million shares traded.  However, the price of Geron securities remained artificially inflated because defendants had failed to disclose the adverse facts listed in ¶38, above.

41.     Then, on September 27, 2018, the Company issued a press release admitting that IMbark had failed to reach its primary end points.  The press release stated in part:

**IMbark Protocol-Specified Primary Analysis Highlights**

IMbark was designed as a Phase 2 clinical trial to evaluate two starting dose levels of imetelstat (either 4.7 mg/kg or 9.4 mg/kg administered by intravenous infusion every three weeks) in approximately 200 patients with Intermediate-2 or High-risk myelofibrosis (MF) who have relapsed after or are refractory to prior treatment with a JAK inhibitor.

The co-primary efficacy endpoints for the trial are spleen response rate, defined as the proportion of patients who achieve a ≥35% reduction in spleen volume assessed by imaging; and symptom response rate, defined as the proportion of patients who achieve a ≥50% reduction in Total Symptom Score, at 24 weeks.  Key secondary endpoints are safety and overall survival.

For the 9.4 mg/kg dosing arm (n=59), highlights from the primary analysis included a spleen response rate of 10% and a symptom response rate of 32%.  No patients achieved complete remission, and one patient achieved partial remission.

42.     Thus, the IMbark study showed only a 10% decrease in spleen volume, when 35% or more was required for success, and a 32% reduction in TSS, when at least a 50% reduction was needed.

- 16 -

43.     Additionally, the Company's press release disclosed that Janssen had terminated its partnership with Geron for the development of imetelstat.

44.     The same day the full results were finally disclosed, Feuerstein published another article on *STAT News* concerning Geron.  The article stated in part that: "Back in March, Geron CEO John Scarlett ignited a steep run higher in the stock price with a suggestion, uttered on a conference call, that imetelstat was prolonging survival in patients with the bone marrow disorder myelofibrosis." Feuerstein characterized this move as a "bait-and-switch tactic," continuing in part:

> The Phase 2 study was designed primarily to determine if imetelstat could shrink spleens and improve myelofibrosis disease symptoms. Geron and Janssen were keeping these data hidden, even though they were readily available. Shifting attention to survival was a smokescreen.
>
> On Thursday, we learned why.  The spleen response rate to imetelstat in the myelofibrosis study was a disappointing 10 percent.

45.     Feuerstein noted in the article that "Geron raised $84 million through highly dilutive stock sales in the second quarter," ultimately concluding that, "[t]aking advantage of the hyped-up stock price earlier this year was a fiscally smart move, although that's small consolation to shareholders left holding the bag."

46.     As a result of these disclosures, the price of Geron common stock plummeted $3.92 per share to close at $2.31 per share on September 27, 2018, a 63% decline, on extremely high trading volume of over 84 million shares traded.

47.    As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased Geron securities at artificially inflated prices, suffering significant losses, and were damaged thereby.

## ADDITIONAL SCIENTER ALLEGATIONS

48.    As alleged herein, Geron and the Individual Defendants acted with scienter in that they: (i) knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Geron and the imetelstat trials, their control over and/or receipt and/or modification of Geron's allegedly materially misleading statements, and/or their associations with the Company that made them privy to confidential proprietary information concerning Geron participated in the fraudulent scheme alleged herein.

49.    The Individual Defendants personally oversaw the Company's partnership with Janssen and the development of imetelstat and held themselves out to investors as the Company representatives most familiar with these issues.  In addition, the Individual Defendants also had the motive and opportunity to commit

fraud.  During the Class Period, the Individual Defendants authorized the Company to sell up to $100 million worth of Geron stock.  Tens of millions of dollars' worth of Geron stock was sold to investors at artificially inflated prices prior to the truth regarding imetelstat being revealed to the market.  This represented necessary financing for the Company in light of the pending dissolution of the Janssen partnership.  As defendant Scarlett acknowledged, "Geron has one major asset, which is imetelstat. . . .  [W]e are dependent really on the one asset for the value of the company."  Similarly, as Geron stated in its SEC filings during the Class Period, "Our ability to raise additional funds will be severely impaired in the event of . . . imetelstat failing to meet the criteria determined by Janssen to support an affirmative Continuation Decision[.]"

## LOSS CAUSATION AND ECONOMIC LOSS

50.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Geron securities and operated as a fraud or deceit on purchasers of Geron securities.  As detailed above, when the truth about defendants' misconduct was revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer propped up the price of Geron securities.  The declines in the price of Geron securities were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and

magnitude of these price declines negate any inference that the losses suffered by plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of the Company's securities and the subsequent significant declines in the value of the Company's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

51.    At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Geron's business and financial condition, as alleged herein. Throughout the Class Period, defendants issued materially false and misleading statements and omitted material facts necessary to make the statements made not false or misleading, causing the price of Geron securities to be artificially inflated. Plaintiff and other Class members purchased Geron securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

52.    Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against defendants are predicated upon omissions of material fact for which there was a duty to disclose.

53.    Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for Geron securities was an efficient market at all relevant times by virtue of the following factors, among others:

(a)    Geron common stock met the requirements for listing and was listed and actively traded on Nasdaq, a highly efficient market;

(b)    Geron regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)    Geron was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for Geron securities promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all those who transacted in Geron securities during the Class Period suffered similar injury through their transactions in the securities at artificially inflated prices and a presumption of reliance applies.

55.     Without knowledge of the misrepresented or omitted material facts, plaintiff and other Class members purchased Geron securities between the time defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed.  Accordingly, plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for Geron securities, and are entitled to a presumption of reliance on defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Geron securities during the Class Period (the "Class").  Excluded from the Class are defendants and their immediate families, the directors and officers of Geron and their immediate families, and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class located geographically throughout the country.   Joinder would be highly impracticable.  Record owners and other members of the Class may be identified from records maintained by Geron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

58.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of the federal laws complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)      whether defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(c)      whether the prices of Geron securities during the Class Period were artificially inflated because of defendants' conduct as complained of herein; and

(d)      whether the members of the Class have sustained damages and, if so, the proper measure of damages.

61.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

62.      Plaintiff incorporates ¶¶1-61 by reference.

63.      During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Geron securities during the Class Period.

65.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Geron securities. Plaintiff and the Class would not have purchased Geron securities at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

66.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Geron securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

67.     Plaintiff incorporates ¶¶1-66 by reference.

68.     During the Class Period, the Individual Defendants acted as controlling persons of Geron within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and power to control public statements by and about Geron, the Individual Defendants had the power and ability to control the actions of Geron and its employees.  Geron controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  March 5, 2020                       SEEGER WEISS LLP
                                            CHRISTOPHER A. SEEGER
                                            CHRISTOPHER L. AYERS


                                                   /s/ Christopher A. Seeger
                                            CHRISTOPHER A. SEEGER

                                            55 Challenger Road, 6th Floor
                                            Ridgefield Park, NJ  07660
                                            Telephone:  212/584-0700
                                            212/584-0799 (fax)
                                            cseeger@seegerweiss.com
                                            cayers@seegerweiss.com

                                            ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)
                                            srudman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff